# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## Butler Brothers–Hoff Company (Inc.) v. Virginian Railway Co.

### January 18, 1912.

1. Contracts—*Construction.*—In the absence of any evidence in an agreement that the words thereof are to be otherwise construed, they are to be taken in their ordinary or popular sense.

2. Contracts—*Construction—"Running Water."*—The phrase "the deepening of channels in running water" in a contract for railroad construction means, in its ordinary or popular sense, the making deeper the bed of a running stream, such as a creek or river, rather than to work in water in the construction of a railroad cut, which collects therein from seepage, wet weather, springs, or otherwise, during the progress of the work in making the cut.

3. Contracts—*Construction—Parties' Construction.*—In construing a contract, where there is a doubt as to its proper meaning, the court may look to the construction which the parties themselves have placed upon it in its execution, in order to ascertain its meaning; and such construction is entitled to great consideration.

4. Contracts—*Practical Construction of Parties—Acquiescence in Construction.*—A railroad contractor who, throughout the construction of the work, has by his acts and conduct placed the same construction upon the contract as did the railroad company, and has accepted the company's classification of the material removed, will be deemed to have acquiesced therein, and cannot, after the completion of the work, claim a higher classification, although he may have secretly, during the progress of the work, determined that he was entitled to the higher classification, and would insist upon it after completion. Such uncommunicated determination cannot affect the rights of the company.

5. Damages—*Replacing Structure—Burden of Proof.*—In an action by a contractor against a railroad company to recover the cost of replacing a trestle which gave way, the burden of proof is on the contractor to prove that the trestle gave way because constructed in accordance with defective plans furnished by the railroad company.

6. Interest—*Tender—Release.*—Where a sum of money, with interest from a given date, is decreed against a railroad company in favor of a contractor, but the latter is not allowed to collect the same until he has executed a release called for by his contract, if the railroad company

wishes to stop the interest on the sum decreed against it, it should pay the money into court, and the court will require the release to be executed before it pays the money over to him. It cannot be relieved from payment of interest upon merely expressing a willingness to pay if the release is executed, when no tender is made, and tender has not been waived.

7. CONSTRUCTION CONTRACT—*Engineer's Certificate—Reasonable Time— Interest.*—Although a construction contract provides that the chief engineer of a railroad company shall give his certificate of the completion of work according to contract, and that the balance due the contractor shall be due within twenty days after the date of the certificate, the engineer cannot unreasonably delay the giving of said certificate. In the case at bar, the work was completed September 27, and the certificate was not issued till December 23, and it is held that there was no error in the decree of the court below in allowing interest from October 20.

Appeal from a decree of the Circuit Court of Campbell county. Decree for the defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Braxton & Eggleston* and *J. T. Coleman,* for the appellant.

*Phlegar & Powell, Hall & Woods,* and *Brown, Jackson & Knight,* for the appellee.

BUCHANAN, J., delivered the opinion of the court.

The principle controversy in this case is as to the amount of compensation which the appellant is entitled to receive for making a cut in the construction of the appellee's line of road, under a contract entered into between the appellant contractor and the railway company on the 9th of December, 1905, for the construction of about six and one-half miles of the latter's roadbed. Upon that section of the road there is a cut known as "Terryville Cut." It is about three thousand feet long and some eighty feet deep at its summit. There is no material difference between the parties as to the number of yards of earth and stone removed in making the cut, but the principal controversy is over the classification of the material removed.

The contract or agreement between the parties is long, covering more than twenty pages of the printed record, and containing thirty-four sections.

Section 23 provides what compensation the contractor is to receive for its work, and, so far as is material to the work in the cut, is as follows:

"The contractor agrees to receive as full compensation for all material used and labor performed in the work, and for the completing the same in all respects according to the aforesaid mentioned plans and specifications, and the requirements of the chief engineer under them, the prices enumerated below * * *

"*Classified Excavation.*

Earth, per cu. yard............................ .27 (cents)
Loose Rock, per cu. yard..................... .40 (cents)
Solid Rock, per cu. yard..................... .85 (cents)
Excavation in Water, per cu. yard.............$3.00

* * * * "

In the general specifications for grading and masonry, which are expressly made a part of the agreement between the parties, all "Excavation" is designated as "classified" or "unclassified," and what is meant by the terms "earth," "loose rock," "solid rock," and "excavation in water," is defined or divided as follows:

"(*a*)    Earth includes clay, sand, gravel, loam, decomposed rock and slate, stones and boulders containing less than one (1) cubic foot, and all other materials, excepting those described below.

"(*b*)    Loose Rock includes all boulders and detached masses of rock measuring over one (1) cubic foot in bulk and less than one (1) cubic yard; also all slate, shale, soft friable sand-stone and soap-stone, and other rock, which, in the judgment of the engineer, may be removed without continuous blasting, although blasting may occasionally be resorted to.

"(*c*)    Solid Rock will include all rock found in ledges, or masses of more than one (1) cubic yard, which, in the judgment of the engineer, can only be removed by blasting. In rock excavations the "bottom" must in all cases be taken truly down to sub-grade; and, when so ordered by the engineer, ditches must be formed at foot of slopes.

"(*d*)  Excavation in Water will apply to foundation pits under water, which, through no fault of the contractor, cannot, in the opinion of the engineer, be ditched or drained, but require pumping, and the deepening of channels in running water; it must cover all classes of material and must include drainage, bailing, pumping, and all materials and labor connected with such excavations; also the necessary benching and dressing of rock in foundations.

"Unclassified Excavation includes all classes of material, of every nature whatsoever, with the sole exception of 'Excavation in Water,' as described above."

The contention of the appellant is that the excavation in "Terryville Cut," or a large portion of it, was "excavation in water," as defined in the contract, and that it was entitled to pay therefor as such.    The railway company insists that under the contract the work in "Terryville Cut" was not, nor was any part of it, "excavation in water" under the contract, and that, if it were, the appellant has waived and is estopped from setting up such claim.

The first question, therefore, to be considered is, what is meant by "excavation in water," as used in the agreement and as defined in the specifications for grading.

The term "excavation in water," as is clear from the language quoted above, does not apply to all excavation in water, but only to two kinds—viz.: (1st) "to foundation pits under water," under certain circumstances, and (2d) to "the deepening of channels in running water."   It is not claimed by the appellant that its work in the cut was work in a foundation pit, but its contention is that it was work done in deepening a channel in running water.

That term, or the words thereof, if used in their primary or ordinary and popular sense, refer, as it seems to us, to work in making deeper the bed of a running stream, such as a creek or river, rather than to work in water in the construction of a railroad cut, which collects therein from seepage, wet weather, springs, or otherwise, during the progress of the work in opening or making the cut.   At least it is not clear that the term was intended to include the latter kind of work.   There is nothing in the agreement to show that the term or words were used in any other than in their ordinary and popular sense.   This being so, viewing the language used in the most favorable light that it can be considered for the

appellant, the most that can be said is that the meaning of the term is not clear, but doubtful. ·

In construing a contract where there is a doubt as to its proper meaning, the court may look to the construction which the parties themselves have placed upon it in its execution in order to ascertain its meaning.

It appears that the work on the cut was commenced in April, 1906, and was completed in September, 1907. At no time during that whole period was the work done in the cut, or any part of it, treated or classified as "excavation in water" by the railway company or its engineers; nor was any claim made by the appellant to the railway company during that period that any part of the work in the cut was "excavation in water," or that there was any error or mistake made in the monthly estimates (some seventeen or eighteen in number) in not so classifying any part of the work done in the cut.

By section 30 of the agreement between the parties it is provided: "So long as the work herein contracted for is prosecuted agreeably to the provisions of this contract, and with such progress as may be satisfactory to the chief engineer, the said chief engineer will, on or about the first day of every month, make an approximate estimate of the proportionate value of the work done thereon, and of acceptable material furnished and delivered upon the company's property at the site of the work, up to and inclusive of the last day of the previous month, based upon the price or prices herein-before specified; and the amount of said estimate certified to as being correct and in accordance with the terms of this contract, after deducting ten (10) *per cent.* and all previous payments, shall be due and payable to the contractor at the office of the treasurer of the company on or about the 20th day of the current month."

· These estimates, as will be observed from the language of the section, were to be based upon the price or prices to be paid according to the provisions of the contract. It was a matter of the greatest consequence to both parties that the work should be properly classified in the monthly estimates, since they were the basis upon which payments were to be and were made from month to month, and it was to the interest of both parties that errors, if any, in classification should be promptly corrected, as the prices

for the different kinds of excavation varied from twenty-seven cents per cubic yard for "earth," to three dollars per cubic yard for "excavation in water," and because of the difficulties that would arise in making corrections after conditions in the cut had changed. The importance of correcting errors, whether in monthly statements or in other statements which the railway company directed its division engineers to furnish from time to time to contractors as to the work done by them, was fully recognized by the appellant, for in one of its letters, written in March, 1906, in acknowledging the receipt of a circular requiring statements to be made by the division engineers, it says: "As a matter of equity, of course, we feel that we should be advised what the engineers allow us, so that we may take exception to same, if we find they are incorrect, at the time that the whole matter is fresh in everybody's mind." In June, 1906, the appellant wrote to the chief engineer of the company that "We desire to call your attention to the matter of wet excavation in Block D–2 of the Tidewater Railway (now the Virginian Railway) for which we have the contract. We have not been allowed the proper amount of wet excavation. Especially would we call your attention to culvert located at station 1507x. The engineers' estimate is 60 yards; our estimate is 273 yards. The discrepancy, you will notice, is quite glaring."

On several other occasions during the progress of the work on the cut the appellant called the attention of the railway company, or its engineers, to errors as to the amount of wet excavation allowed on other parts of its work. In April, 1907, when the work in the cut was far on its way to completion, and long after the conditions had arisen which entitled the appellant, as it claims now, to have the work in the cut classified as wet excavation, it wrote that "our estimates have not for months furnished money enough to meet even the pay-roll—to say nothing of supplies and materials. The cause lies largely in classification. In 'Terryville Cut' the rock we could see and bid on is called largely loose rock. The average of extreme hard and extreme soft would produce a hard rock. We hope you will rectify this in this month's estimate." In other parts of the letter complaint is made that wet excavation at other places of its work was not fully estimated.

While the appellant complains that the rock in the cut is being classified as "loose rock," when it should be classified as solid, there is no suggestion that there is any error in failing to classify any of the work done as "excavation in water."

It clearly appears from the record that the railway company always placed the same construction upon the contract as to what was meant by wet excavation, and that the appellant, by its acts and conduct, placed the same construction upon it during the whole time the work in the cut was being done, and that it never, in its dealings with the railway company, suggested even, much less claimed, the construction it now contends for, until some time after the work was completed and after a final estimate was asked for.

But the appellant insists, notwithstanding its acts and conduct in placing the same construction upon the contract as did the railway company, that during the progress of the work it came to the conclusion, on account of the gradual development of the water difficulties in the cut, that the work therein, at least after that time, was "excavation in water," and that it intended, as it believed it had the right to do, upon the completion of the work, to insist upon compensation for it as "excavation in water."

The record shows that during the progress of the work the question of what was its proper classification was considered by the officials of the appellant company and its sub-contractors, and the conclusion reached that the work in the cut was excavation in water; but it further appears that no notice of this conclusion, nor of the appellant's determination to assert a claim for a different classification when the work was completed, was given the railway company. On the contrary, the appellant deliberately determined not to give the railway company any notice of such conclusion and intention, but to postpone making any objection to such classification until after the work in the cut was completed, for fear, as it is claimed, that, if it did so, the railway company might take the work away from the appellant under certain provisions of the contract, and have it done at prices that would be hurtful to the appellant. In other words, the appellant determined not to make objection to the classification of the work in the cut when in justice and fair dealing it ought to have done so, but to postpone the claim for a different classification until the work had been

completed, when it would be too late for the railway company to exercise those rights under the contract which the appellant feared it might exercise if it (the appellant) made known its claim for a different classification earlier.

Whatever may have been the construction placed upon the contract by the appellant in secret and unknown to the railway company, it cannot be considered in determining either the practical construction placed upon it by the parties or the acquiescence of the appellant in the construction placed upon it by the railway company. *N. & W. Ry. Co.* v. *Mills*, 91 Va. 632, 22 S. E. 556. It is clear, therefore, that during the entire time the work in the cut was being done, the appellant, by its *acts and conduct*, placed the same construction upon the contract, as to the matter now under consideration, as did the railway company.

In *Kidwell* v. *B. & O. R. R. Co.*, 11 Gratt. (52 Va.) 676, it was held that a railroad contractor for the construction of a bridge, having received the monthly estimates, based upon a particular construction of the contracts, without objection during the progress of the work, had acquiesced in that construction. In that case, Judge Moncure, speaking for the court, after stating the facts and circumstances showing the conduct of the parties during the progress of the work (and which were at least as favorable to the contractor's contention in that case as are the facts and circumstances of this case to the appellant's contention), said: "Under all these circumstances, I am of opinion that whatever may be the true construction of the contracts, the appellant acquiesced in the construction placed upon them by the appellees, and is concluded by such acquiescence from claiming a higher compensation for the masonry than the prices stipulated for in the contracts and allowed in the final estimates."

In *Knopf* v. *R., F. & P. R. R. Co.*, 85 Va. 769, 8 S. E. 787, it was held that the practical construction put by the parties upon the terms of their own contract was not only to be regarded, but, where there is any doubt, it must prevail, even over the literal meaning of the contract; citing, among other authorities, *District of Columbia* v. *Callaher*, 124 U. S. 505, 510, 31 L. Ed. 526, 8 Sup. Ct. 585, 588, in which it was held that "the practical construction which the parties put upon the terms of their contract, and accord-

ing to which the work was done, must prevail over the literal meaning of the contract, according to which the defendant seeks to obtain a deduction in the contract price."

In *Knick* v. *Knick*, 75 Va. 12, 20, it was said by Judge Burks, that "when the meaning of an instrument is clear, an erroneous construction of it by the parties to it will not control its effect; yet where there is *doubt* as to the proper meaning of it, *the construction which the parties have put upon it* is said to be entitled to great consideration. *Bank of Old Dominion* v. *McVeigh*, 32 Gratt. (73 Va.) 530, 541, citing *Railroad Co.* v. *Trimble*, 10 Wall. 367, 377." [19 L. Ed. 948.]

In *Trigg Co.* v. *Bucyrus Co.*, 104 Va. 79, 86, 51 S. E. 174, 176, it was said: "If the terms of the contract were ambiguous and its proper construction doubtful, it could be subjected to another test, which is always entitled to great weight under such circumstances— and that is the construction which the parties have, by their acts, placed upon it."

The president of the court, in delivering its opinion in *Northrop and Wickham* v. *Richmond*, 105 Va. 335, 339, 53 S. E. 962, 963, said: "It is the duty of courts to get at the true intent of the parties to the contract, and it is a recognized and accepted canon that, where the construction is doubtful, it is proper to look to the construction which the parties themselves have placed upon the contract. What more natural, indeed, than that the courts, in order to ascertain the intention of the parties, should seek for light in the construction which the parties themselves have placed upon the language which they have seen fit to employ." In that case it was held that where the proper construction of the language of a contract is doubtful, and the parties themselves have in practice adopted a particular construction, the courts will adopt that construction.

We are of opinion that the practical construction placed upon the terms of the contract as to the classification of the work in the cut during the entire period in which the work was being done should prevail over the construction now insisted on by the appellant, by which it seeks to obtain a new classification and a largely increased compensation for its work.

The action of the trial court in not allowing the appellant

compensation for two items, aggregating $572.42, for extra material and labor on Turnip creek trestle, is assigned as error. The contention of the appellant is that these two items of extra labor and material were rendered necessary by the defective plans of the railway company's engineers, in consequence of which the work, built in accordance with those plans, gave way and had to be strengthened by the additional work and material for which these items were charged.

The railway company denies its liability upon two grounds— one, that the cause of the trestle's giving way was the improper use made of it by the contractor after it was constructed; and the other, that under section 18 of the contract the contractor assumed all loss resulting from the giving way of the trestle during the progress of the work.

Whether or not this latter contention be well founded need not be considered, for if the appellant was not, under the contract, bound to bear the loss complained of, it does not satisfactorily appear that the trestle gave way on account of any defect in the plans furnished by the railway company.

The evidence is conflicting as to whether the trestle gave way because constructed in accordance with defective plans furnished by the railway company's engineers, or from the improper use made of the trestle by the appellant after it was constructed. As the burden was upon the appellant to show that it was entitled to the items claimed, we cannot say that the trial court plainly erred in refusing to allow them as proper charges against the railway company.

Another error assigned is to the action of the circuit court in not allowing an item of some fifteen thousand dollars, the difference in the value of the work done upon the whole of the appellant's section of road, as estimated by its supervising engineer (excluding wet excavation in Terryville cut), and the value of the whole work as shown by the final estimate of the chief engineer of the railway company. These different results as to the value of the work done seem to have followed largely from the difference in the data upon which they respectively based their calculations. It could serve no good purpose to discuss in detail the methods of measurement relied on by each as furnishing the correct data. It will be

sufficient to say that while there is a conflict in the evidence as to the correctness of the data used by each, the weight of evidence is clearly in favor of that upon which the chief engineer based his calculations and made his final estimate, an estimate the correctness of which, upon the data used by him, is clearly established.

We are of opinion that, independent of any question as to the conclusiveness of the final estimate of the chief engineer under the provisions of the contract, the final estimate by him is fully sustained by the evidence, and that the trial court did not err in not allowing the item in question.

The railway company assigns as cross-error the action of the circuit court in allowing interest from the 20th of October, 1907, on the amount adjudged to be due the appellant, and decreed in its favor.

By section 31 of the contract it is provided, among other things, that, upon the final completion and acceptance of the work to be done, the chief engineer of the railway company shall issue a certificate over his signature that the whole work provided for in the contract has been completed and has been accepted by him under the provisions of the contract, whereupon the entire balance found to be due the contractor shall be payable within twenty days after the date of said final certificate—provided, however, that if the railway company should require it, before making payment of said final balance, the contractor shall execute a release to the railway company from all claims or demands whatsoever growing out of the contract.

The court, by its decree of the January term, 1910, ascertaining the amount due the contractor from the railway company, provided that such sum should bear interest from the 20th day of October, 1907, until paid, and that principal and interest should be paid in twenty days from the date of the decree, upon the delivery of the release required to the railway company by the contractor.

The contractor having failed to deliver the release required, the following proceedings were had at the May term following:

"The parties consent that the motions hereinafter mentioned may be heard and determined by the judge of this court in vacation, to the same effect as if they had been made and passed upon at the last regular term of this court."

"And thereupon, the defendant submitted a motion in writing, (which is now filed) that the court so amend the decree entered in this cause at January term, 1910, as to provide that the amount decreed in favor of the plaintiff shall not bear interest from the date of entry of the said decree until the plaintiff files with the papers in this cause the release required by the said decree to be delivered by the said plaintiff to the defendant, and that, upon the filing of such release, the amount so decreed in favor of the plaintiff shall bear interest as provided in said decree until the defendant pays the amount of said decree to the plaintiff; which motion the court doth overrule.

"And thereupon, the defendant's counsel, stating in open court, that the defendant was willing to pay to the plaintiff the amount, decreed in its favor by the decree of January term, 1910, with interest thereon to this date, upon the execution by the plaintiff of the release provided for by the said decree, but the said offer to be without prejudice to the defendant's right to assign cross-error in case an appeal is taken from the said decree by the plaintiff; and thereupon moved the court to release it, the said defendant, from the payment of any interest that may accrue after this date on the amount decreed to the plaintiff by the said decree of January term, 1910, until the said release is executed and filed with the papers in this cause; and the court having considered said motion, and the defendant's counsel stating that he does not now actually tender the amount of the said decree, either to the plaintiff or to the court, and the plaintiff not waiving actual tender, the court doth overrule the defendant's second motion."

We see no error in the action of the court in overruling either of these motions. If the railway company wished to stop the running of interest on the sum decreed against it, it could have paid the money into court, and the court would have required the release to be executed by the contractor before it could receive the money, and thus have fully protected the railway company.

Nor do we think that the court erred in its original decree providing for interest on the sum decreed before the chief engineer had issued his certificate that the work had been completed and accepted. The work was completed on the 27th of September, 1907; the railway company was at once notified of that fact, and

afterwards urgently requested to issue the required certificate; but it was not issued until the 23d of December, 1907. The delay in issuing the final certificate is not satisfactorily explained or accounted for. A large sum was admittedly due the contractor, and it ought not to be made to bear the loss resulting from the unreasonable delay of the chief engineer in issuing the certificate required.

Upon the whole case, the court is of opinion that the decrees complained of should be affirmed.

*Affirmed.*